J. N. H. CORNELL & CO., Inc., v. VIRGINIA AIR LINE RY. CO

(Circuit Court of Appeals, Fourth Circuit. December 7, 1912.)

No. 1,103.

1. CONTRACTS (§ 305*)—MODIFICATION—CONTRACT TO BUILD RAILROAD—EX-TENSION OF TIME.

Complainant contracted to build a railroad for defendant to be com-pleted by a certain date, unless delayed by causes beyond its control. During the progress of the work disagreements arose between the parties, especially as to the provisions of the contract with respect to ballasting, and the work was delayed, so that completion by the time fixed was impossible. It was of great importance to defendant that the road should be completed to a certain town by that date, and its president made a proposition to complainant that it should lay the track to such town without ballast, and that defendant would do the ballasting for a stated reduction from the contract price, also stating that, if accepted, it should "close all minor questions, if any, unsettled, time of comple-tion," etc. A counter proposition somewhat differing in terms was ac-cepted and carried out, and the work was thereupon completed and accepted. *Held*, that such modification of the original contract was a waiver by defendant of all claims for damages for failure to complete the work by the time agreed, and that all that was required of com-plainant thereafter was to prosecute the work with due diligence.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1398, 1399, 1467–1475; Dec. Dig. § 305.*]

2. CONTRACTS (§ 246*)—MODIFICATION—CONSTRUCTION AND EFFECT.

A supplemental contract modifying a contract for the building of a railroad, made after the work had been partially completed, for the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

purpose of settling differences and controversies which had arisen respecting the provisions of the original contract, construed, and its effect on the rights of the parties determined.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1131–1138; Dec. Dig. § 246.*]

Appeal from the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry C. McDowell, Judge.

Suit in equity by J. N. H. Cornell & Co., Incorporated, against the Virginia Air Line Railway Company. Decree for defendant, and complainant appeals. Reversed.

George Perkins, of Charlottesville, Va., and Charles V. Meredith, of Richmond, Va. (Moon & Fife and Perkins & Perkins, all of Charlottesville, Va., and Meredith & Cocke and Samuel A. Anderson, all of Richmond, Va., on the briefs), for appellant.

Aubrey E. Strode, of Amherst, Va., and Randolph Harrison, of Lynchburg, Va. (C. W. Allen and Harmon & Walsh, all of Charlottesville, Va., on the briefs), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. The Virginia Air Line Railway Company is the appellee. It will be called "the company." It is a Virginia corporation. It was formed to build and operate a railroad to connect the tracks of the main line and of the James River division of the Chesapeake & Ohio Railroad system. The new road was to cross Fluvanna county, Va., from north to south. It was required to have its line in operation from either one end or the other to a point within 1½ miles of the county courthouse at Palmyra not later than May 1, 1908. Trains were to be running over the entire road by December 1st of that year. J. N. H. Cornell & Co., Incorporated, is the appellant. It will be referred to as "the contractor." It is a New Jersey corporation.

On December 3, 1906, the contractor and the company entered into a written agreement. Such agreement will be spoken of as the December contract. By its terms the contractor was to locate and design the railroad, which was to extend from the Chesapeake & Ohio Railroad at or near Lindsey to a connection with the tracks of the James River Division of that company at or near Bremo Bluff, a distance of about 29 miles. The company was to pay the contractor the actual cost of engineering, locating, designing, and constructing, and, in addition, a fixed fee of $91,250. The contractor guaranteed that such cost, including the fee, should not exceed $656,000. The guaranty was conditional, not absolute. It was not to be binding should the total length of the line exceed 30 miles, or if the aggregate amount of material moved exceeded 700,000 cubic yards classified as specified in the contract. In the latter event the guaranteed cost was to be raised. Certain unit prices were stated in the agreement in accordance with which was to be determined the excess, if any, over the guaranteed cost to which the contractor might be entitled. In no event was that cost to

exceed $706,000. None of the figures named were to include extra work. For that the contractor was to be paid 12½ per cent. more than it cost him. The company could not call on the contractor to expend more than $41,600 on station buildings, sidings, water stations, road-crossings, and accommodation works, nor "in excess of $888.88 per mile for placing ballast in the track." The company had the right within those limits to direct as it saw fit the distribution of such sums. By the specifications it was agreed that "tracks shall be brought to true surface and line on the ballast as provided for in the contract." The contractor bound itself in any event to have the railroad constructed from either terminal as it might elect to within 1½ miles of the courthouse at Palmyra by May 1, 1908. It was to finish the entire work by that day unless delayed "by strikes, fire, flood, riot, lightning, violence of the elements or other causes beyond" its "control." The company had the right at any time before February 1, 1907, to adopt another route. If it exercised this privilege, the contractor was no longer bound by the guaranties as to costs or quantities of work, material, and time. Various things happened, both before construction actually begun and afterwards, which the contractor said amounted to a change of route by the company. The court below was of opinion that this contention could not be maintained. It is not made here. It is mentioned because that it was once made and strenuously insisted upon throws light upon the attitude in which the parties stood to each other at the time of subsequent negotiations, agreements, and transactions between them.

As time went on and the work progressed, the relations between the president of the company and the contractor became strained. They had a number of disputes. Some of these were settled to the satisfaction of the one; some in accordance with the views of the other. A number of the most serious remained open at least as late as April, 1908. As the year 1907 drew to a close, and in the early months of 1908, the president of the company became much exercised. He and the contractor could not agree as to the exact location for the southern terminal. The precise kind of ballast to be used, where it was to be bought, and how much was to be paid for it had not been determined. At first both parties had hoped that suitable ballasting material could be found along the line of the road in quantities and under conditions which would make its use wise and economical. At a later period the contractor thought that such material would have to be purchased elsewhere and for an appreciable distance hauled over other railroads. If this belief was correct, the $888.88 a mile, which was the maximum the company could call upon the contractor to expend for placing the ballast in the track, would not suffice to pay the price of enough ballast and of delivering it in the track, to say nothing of the expense of properly aligning and surfacing the track upon it. The company said the contractor was bound to do the surfacing and aligning without having any right to charge the cost of doing it against the $888.88 per mile. The contractor asserted that the true meaning of the contract was that the $888.88 a mile was to cover all the expense of ballasting the road, using the word "ballasting" in its

most comprehensive sense. The company called attention to the fact that the specifications provided that the track should be brought to true surface and line on the ballast, and claimed that the limitation of $888.-88 per mile applied only to the expenses of placing the ballast in the track. It said that the work of getting the ballast under the ties and rails, and of surfacing and aligning the track on the ballast, was not accurately described by the words "placing ballast in the track." It claimed that practical railroad men would understand the contract as it did. It argued that $888.88 per mile was but a little more than half the sum required to provide the right kind of material in sufficient quantities and to ballast the road for the kind of traffic which both parties knew would use it. The contractor said that the entire work of ballasting a railroad was not inaccurately or inaptly described by the words "placing ballast in the track"; that while. it was true that the specifications required that tracks should be brought to true surface and line on ballast, those words were limited by the phrase "as provided for in the contract"; that the contract said nothing about ballasting other than to limit the expense to which the contractor should be put for placing ballast in the track to $888.88 per mile; and that, therefore, the words in the specifications could have had no other meaning than to make clear that the contractor's obligation to line and surface was restricted to the expenditure of· a sum not exceeding $888.88 per mile for ballasting. It had its practical men to indorse its understanding of the contract phraseology. It claimed that the ·contract itself was necessarily entered into in haste; that neither party at that time did or could know where the ballast could be obtained or how much it would cost. It now says that the meaning of the limitation in the agreement cannot be read in the light of subsequent events.

The quarrel was a serious one as it stood. It was likely to delay the completion of the road, if it had not already done so. The contractor wanted to buy expensive ballast elsewhere, and to place it at once in such parts of the line as were ready for it. The company thought the price asked for it was much too high, and in any event, in the company's view, it should not be placed upon the road in the months of January, February or March; that is to say, not until the frost was well out of the ground. Under the terms of the contract, the ballast could not be purchased except with the consent of both parties, no matter how the dispute as to construction might be settled. If trains were not running from one terminal or another to or within one and a half miles of Palmyra by May 1, 1908, the consequences to the company would be of the most serious character. Under the conditions as they existed in March and early April, 1908, it was certain that the road could not be completed and ballasted as required by May 1, 1908. Moreover, the contractor claimed that it was not bound by the guaranties of cost and time of completion contained in the December contract. It said that the changes of route which had been made released it from them. The company's financial resources were limited. It could not meet any considerable increase of cost above the sum of $656,000 plus the price of the extras which it had already or-

dered. From its standpoint it was of first importance to get the ballasting out of the contractor's hands and into its own. It wanted the southern terminal definitely fixed. It was imperative that the one-half of the road from Palmyra to the northern terminal should be turned over to it by May 1st in such condition that trains could be operated. Whether that part of the road was then ballasted or not was for the moment of subsidiary importance. It wished very much to obtain a new guaranty of total cost which would limit the maximum cost, excluding extras, to $656,000, if possible, but which, in any event, would restrict any excess thereover to such sum as the December contract itself provided should be payable in the event that the material to be moved, in quantity or difficulty, exceeded the estimates therein made.

For some months the president of the company had been trying to effect an arrangement by which the company would be protected against some or all the dangers to which it was in his apprehension exposed. To this end on March 6, 1908, he appears to have put in writing certain suggestions. This was done in the form of a letter to the bankers who were the financial agents of the company. This communication does not appear to be in the record. In a letter from the president of the company to the contractor under date of April 3, 1908, quotations are made from it. Under date of April 3d he states that he had proposed to the contractor that both parties should "agree upon Upper Bremo as the southern terminus, and the minimum contract price, viz., $656,000, to be the full amount to be paid out of which is to be used the appropriation for ballast and for buildings, sidings, etc., $41,600 and $888.88 per mile, respectively. "(2) That the contractor put the road to a good running surface and line, on dirt, at profile grade. That we take the road in this condition and do the ballasting ourselves; that is, use the $888.88 per mile allowed in the contract for the purchase of ballast and we do the surfacing and lining on the ballast. (3) With this agreement, which is also giving the contractor some advantage, to be finally closed all minor questions, if any, unsettled, time of completion," etc.

These propositions the president of the company reviews. He added:

"As I understood from you on yesterday, you desire to make this arrangement, provided you might not be embarrassed at some future time by claims such as the Steele Bros. matter, and thus have your quantities increased to your disadvantage. In connection with this feature, we would be willing to supplement the arrangement as made on March 6th with the following proviso: Should it occur after this agreement that any of your subcontractors, including the case of Steele Bros., should set up and establish a claim for reclassification, thus necessitating your paying them a greater amount than previously estimated, and establishing the quantities at a greater figure than named in the original contract, we would be willing to disregard the agreement as herein made and let our relations rest entirely upon the original contract."

On the 6th of April the contractor replied. It said:

"At your request we are willing to permit the Virginia Air Line Railway Company to do the ballasting, and will allow a deduction from our contract, for this purpose, of $26,044.18, which is at the rate of $888.88 per mile for the 29.3 miles.

"We will align the skeleton track and put same in fair running surface on the subgrade in order to permit the operation of trains.

"We are further willing to agree that the line, as terminated at Upper Bremo, will be completed within the minimum guaranteed cost of $656,000 less the $26,044.18 allowed you for ballast, but exclusive of extra work that has been performed, or may be performed between now and the completion.

"It is understood that in agreeing to the minimum price of $656,000 that should it occur after this agreement that any of our subcontractors (including W. I. Steele, whose claim is now pending) should set up and establish claims for reclassification, thus necessitating our paying them for a greater amount of material than our estimates and measurements show, that the above agreement as to total cost of road to Upper Bremo is null and void and that the provisions of the contract of December 3rd, 1906, are to apply.

"All other matters, as contained in your memorandum sent us on April 3rd, will be adjusted as the original contract of December 3rd, 1906, provides, and are not to be taken into consideration in this agreement, which is only to apply to the question of ballast and costs to the present terminus, as above stated."

This proposition was accepted in writing by the company on the 14th of April, 1908. The memorandum related to various matters in which the company complained that the work already done was not up to specifications. It is this letter of April 6th which in this litigation is referred to as the April contract. On May 1, 1908, 15 miles of the railroad from Lindsey to 1½ miles of Palmyra courthouse was delivered by the contractor to the company and accepted by it as being a skeleton track in fair running surface on the subgrade. On the 22d of August the remainder of the road was similarly delivered. The company purchased the ballast, and did all the work of ballasting at an aggregate cost, as found by the master and the judge below, of $46,520.18, of which $26,044.18 was expended for the purchase of material, and for delivering it on the track and $20,476 for the cost of aligning and surfacing the track on such ballast. In June, 1908, the W. I. Steele referred to in the April contract recovered a judgment in the circuit court of Fluvanna county against the contractor for $1,864.03, more than by the contractor's estimates was due him. In July the company made a claim against the contractor of many thousands of dollars as damages for failure to complete the road by May 1st. On October 16th the contractor recorded in the proper clerk's offices a mechanic's lien against the railroad for $83,256.96. In effect this sum was arrived at by charging the company with, first, the fixed fee of $91,250; second, with the actual cost of all work which the contractor thought was covered by the contract; third, with the actual cost of all extra work plus 12½ per cent., and by crediting the company with the sums which the contractor had received from it. In form the $91,250 does not appear in the account, but the credits given to the company in it were $91,250 less than the contractor had actually received. The net result was therefore as above stated.

It will be perceived that this account altogether ignored the guaranties of minimum cost given by the December contract. It was made up upon the theory that the company had directed a change of route, and by so doing had released the contractor from his guaranty. The actual cost as stated in this claim exceeded by about $65,500 the sum

which the court below held the contractor under the guaranty was entitled to charge against the company. In its account the contractor claimed some $4,000 more for extra work than the court allowed. It did not charge itself with any damages for delay in completing the work. The court below held it liable for nearly $35,500 therefor. In other words, upon the court's view of the law and of the facts, this account erred in favor of the contractor to the extent of about $105,-000. The contractor by it claimed that the company owed it $83,236.-96. The court decreed that the contractor owed the company $21,-778.03. In so stating the final outcome of the litigation below we have anticipated the march of events. That litigation was begun by the filing of a bill by the contractor to enforce his asserted lien. The court held that it had acquired none. It was, however, of opinion that his bill could and should be sustained as one for an accounting. Under the circumstances shown by the record, we concur in both these conclusions.

The controversies as to extra work were of the usual character. The parties differed as to whether a number of things which the contractor did were required by the contract or were outside of it, and for which it was entitled to extra compensation, and as to the amount of such compensation when any was due. There was a dispute between them as to whether, when the contractor turned the road over to the company, it was in the condition in which the contractor by the contract of December, as modified by that of April, was bound to put it. On these questions much testimony was taken. The contentions of the parties were carefully considered, first, by the special master, and afterwards by the learned and painstaking judge of the court below. Some of them were decided in favor of the company, some in favor of the contractor. The latter appeals. The former does not. The questions involved in the controversies mentioned in this paragraph are almost purely of fact. It does not appear to us that a mistake has been made as to any of them. So far as the decree below deals with them, it will be affirmed.

[1] The contractor by its assignments of error challenges two other determinations of the court below. It says that it should not have been charged with the sum of $20,476, being the amount expended by the company for ballasting in excess of the sum of $888.88 per mile, which by the April contract the contractor agreed to pay or allow for ballasting; or with the sum of $35,443.75 as damages for not completing all of the road by May 1, 1908. We shall not consider its objections to the amount of such claims. Whether they or either of them is too large depends upon matters of fact as to which the testimony was conflicting. The special master and the judge were of one mind as to them. We cannot say that any mistake was made. Whether the contractor was liable at all on these accounts, or on either of them, involves questions of law which must receive our independent consideration. It may tend to clearness if we first inquire whether such liability can be sustained as to the ballasting and the time limit, if it be assumed that the April contract remained in force. It is not disputed that by that contract the contractor was relieved of all re-

sponsibility for ballasting, using that word in its broadest sense. The company expressly undertook to furnish the ballast and to do the subsequent work required. For this the contractor was to allow it $888.88 per mile, or $26,044.18 in the aggregate, and no more. So much the company admits. It did below claim that the contractor had not delivered the road with the skeleton track aligned and put in fair running surface on the subgrade in order to permit the operation of trains. It claimed $7,500 damages for such failure. The master and the court below held that such claim had not been made out. The company did not appeal. In this court it does not dispute that, if the April contract still governs the relations of the parties, it is not entitled to the allowance of $20,476 made to it below or to any part of it. It does say that the April contract did not relieve the contractor from the obligation to complete the road by May 1st, and that the decree in its favor and against the contractor for $35,443.70 for delayed delivery is right, whether the contract of April is or is not now binding upon the parties. The learned judge below apparently agreed with this contention, although, in view of his conclusion that the April contract had been abrogated, he did not find it necessary to make an express ruling upon it. When that contract was made, it was obvious to every one that one-half of the road would not and could not be turned over to the company on the day fixed by the December agreement for the completion of the entire work.

One of the purposes of the April contract was to reduce the number of open questions. The president of the company in his letter of April 3d said that, if the agreement was made, it would finally close all minor questions if any unsettled, time of completion, etc. It is true that the proposition made by the letter of April 3d was not accepted by the contractor. The latter made a counter offer of its own which in some respects differed from it. Nevertheless, any one with the letter of April 3d before him would be justified in believing that all claims for damages for delay would be waived if as the result of the negotiations then pending a mutually acceptable agreement should be reached, unless in that agreement an express reservation of such claims should be made.

Our attention has been called to the fact that the president of the contractor testified that he would not consent to be bound to any specific time for completion, and had therefore rejected that part of the letter of April 3d. Obviously in so testifying he could not have had before him the letter of April 3d, for there is nothing in it which fixed or attempted to fix any time limit. On the other hand, it expressly waived one. The letter and the testimony of both the company's president and the president of the contractor show that negotiations which culminated in the letters of April 3d and 6th, and the formal acceptance of the latter by the company, had been going on for some months. In the course of these negotiations the contractor had refused to make a time limit a term of any new agreement. When the April contract was made, the company did not say that it reserved the right to claim damages for delay. As we have seen, it is possible to construe what it did say as an express waiver of any right to

make such claim. The most that from its standpoint can be contended is that it was silent. Under all the circumstances that was not enough. If the April contract is still binding on the parties, the contractor was relieved from the obligation to finish the work by May 1st. All that it undertook under that contract to do was the implied obligation to press the work thereafter with all due and reasonable diligence. It was no longer bound to finish it by a day certain. The record does not show that it failed to use such diligence. The learned judge below was, however, of opinion that the contract of April had become null and void except as to those things which had been actually done under it and which were beyond human power to undo.

[2] Both the contracts, as well that of December as that of April, were peculiar. They are hard to construe. Sometimes under such circumstances what seems obscure is made plain by the practical construction which the parties by their conduct gave them. If in the case before us we attempt to interpret what the parties agreed to do by what they did, and by what they said, the difficulties are augmented. Indeed whatever interpretation be put upon them, some problems, both logical and practical, will remain unsolved. Any possible solution will be inconsistent with much which was done and said by the party in whose favor it is given. In its bill below the contractor relied on the December contract. In its answer the company on that of April. Before the case came on for final hearing below, they had reversed their positions. The company then said, as it still says, that the April contract had been abrogated. The contractor thought it was in most respects in full force and effect. During the course of the litigation each appears from time to time to have taken whatever position with reference to these contracts seemed at the moment to hold out the greatest promise of a maximum recovery against the other. The task of doing justice between them has not thereby been made easier.

The contention that the April contract was abrogated turns upon the construction to be put upon the fifth of its paragraphs. The company now contends that the recovery in June, 1908, by W. I. Steele was of a judgment against the contractor for some $1,864.03 in excess of the amount admitted to be due him, and the affirmance of that judgment by the Supreme Court of Virginia put an end to the April contract and relegated the parties to that of December. The court below so held. The company, however, does not admit that it is liable to the contractor for the amount of such judgment. The court below was of opinion, as we think rightly, that it was not. What did follow from the recovery of such judgment, it is said, was that the contractor could require the company to pay whatever sum in excess of $656,000 it was able to show under the December contract the quantity and kind of material excavated entitled it to. Below this excess was determined to be $3,435.82.

The fact that such judgment for $1,864.03 was given and affirmed made the contractor liable in the view of the company and of the court below for $20,476 for excess cost of ballasting for which it is admitted it would not have been liable had such recovery not been had, and for $35,443.75 damages for delay for which, in our opinion, it

would not have been otherwise bound. In other words, the effect of the recovery of the subcontractor's judgment was to benefit the company by the difference between $20,476 plus $35,443.75, or $55,919.75, and $3,435.82; that is to say, the contractor lost by the judgment, in addition to its amount, the net sum of $52,483.93. This must have been an unlooked for result of a provision inserted in the April contract for the protection of the contractor. Moreover, if the construction contended for by the company is correct, it made no difference how small the subcontractor's recovery might have been. The same result would have followed if he had made good a claim to $5 as if he had shown that he was entitled to $10,000.

At the time the April contract was made, the Steele suit was pending. The possibility, if not the probability, that it might result in some recovery for the plaintiff, was in the minds of both parties. Could they really have intended that if, for example, he had recovered a judgment for $5, all the adjustments they had been at so much pains to make should go for naught? In view of the strained relations then existing between the parties and the controversy they had had over ballasting, was it likely that the contractor would have agreed that it should still be responsible for all the cost of ballasting, although it would have no right to control, or even supervise, the purchase of the material or the doing of the work? Is it probable that either of the parties to an agreement for the settlement of differences and controversies would have deliberately inserted in it a provision which would have made it impossible, perhaps for years, to know whether the contractor was liable to the company for items which might run up into many thousands of dollars and have amounted to $55,000? The company could not have anticipated that such a proviso would be of much protection to it. If the contractor had understood that the recovery of a small judgment by a subcontractor against it would have cost it so dear, would it not have been very easy for it to have settled the claim of such a subcontractor out of court by a revision of its own estimates or otherwise? In this manner it would have avoided the costly result for which the company now contends. Nevertheless, the parties were dealing at arm's length. They knew, or should have known, their own business. There was nothing unlawful or contrary to public policy in the bargain the company now says that they made. If they did make it, they are bound by it, but before a court will hold that they did it must be persuaded that the words they used could not mean anything else. Did they so express themselves? The language they used was that in the event of the establishment of the claim of a subcontractor for an amount exceeding the contractor's estimates the above agreement *"as to the total cost of the road to Upper Bremo"* shall be null and void. The italics are ours. The more natural interpretation of this phraseology is that the agreement was in the contingency provided for to remain in full force and effect except as to the stipulation limiting the total cost. It is true that this construction left the company unprotected against the possibility that such cost would exceed the minimum amount named in the agreement. The company's engineer, however, had been in more or less

close contact with the work as it had proceeded. By April, 1908, the construction had reached a point at which a relatively close approximation could probably be made as to quantity and character of material that had been or would be moved. In point of fact the court below has ascertained that the excess compensation to which the contractor became entitled under the December contract was $3,435.82. The agreement was a waiver of the contractor's claim that there had been such a change of route as abrogated the cost guaranty of the December contract. The items of the account filed by the contractor with its mechanic's lien claim showed that it asserted that it was entitled to some $45,000 over and above the $656,000 named. It is true that the contractor, in spite of the April agreement, did insist that it could recover this $45,000. We do not think that a reasonable construction of the April contract would have entitled it to have done so even had there been in fact a change of route, as there was not. The contractor's estimates and measurements were important only in the event that the guaranties of cost in the December contract were still effective. If by change of route they had been nullified, the contractor was entitled to recover not on estimates and measurements, but on the basis of the actual amount expended by it. In this view of the case there was sufficient reason why the company should have entered into the April contract even construing that contract, as we do, as constituting an absolute irrevocable waiver by it of all claims that the contractor should contribute to any part of the cost of ballasting, or should be answerable in damages for delay.

By the April agreement the company gained a number of things which it greatly desired. It is not at all improbable that it might have been willing to take the chance of the contractor being able to show that more material in the aggregate, or a larger proportion of the more costly kinds, had been removed. Any other construction will in our opinion do more violence to the language of the contract, and will involve greater hardship and injustice. It follows that so much of the decree below as holds the contractor liable for $20,476 excess cost of ballasting, and for $35,443.75 damages for delay in completion, must be reversed. As the decree was in favor of the company for the principal sum of $21,778.23, the disallowance by us of these two items aggregating $55,919.75 requires a decree in favor of the contractor for the difference between these two amounts, or $34,141.72. The decree below allowed interest on the sum found to be due the company from October 1, 1908. The contractor set up large claims which could not be sustained. If such claims had not been made, the litigagation might have been more speedily disposed of, and it certainly would have cost very much less.

Under the circumstances, we think substantial justice will be done if the principal sum found to be due to the contractor shall not begin to bear interest until March 22, 1910, at which date the learned judge below decided that the more extravagant claims of the contractor must be eliminated.

Reversed.